IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| EPL OIL & GAS, LLC, | § § § § § § § § § § § § § | |
| Plaintiff, | | |
| v. | | Case No. 6:22-cv-208-JDK |
| TRIMONT ENERGY (NOW), LLC, et al., | | |
| Defendants. | | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff EPL Oil & Gas, LLC ("EPL") sued Defendants Trimont Energy (NOW), LLC and Whitney Oil & Gas, LLC in state court for breach of contract. Defendants removed the action to this Court, invoking jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331, *et seq*. Defendants then sought to dismiss and compel arbitration, citing the parties' contract. Docket No. 2. EPL moved to remand to state court for lack of subject matter jurisdiction, and also opposed arbitration. Docket No. 7.

As explained below, the Court holds that removal was proper because the dispute arises under OCSLA. The Court also holds that the case should be referred to arbitration because a valid and binding arbitration agreement exists and the parties agreed that an arbitrator, not the court, should decide whether a claim is arbitrable. Accordingly, EPL's motion to remand is **DENIED**, and Defendants' motion to dismiss and compel arbitration is **GRANTED**.

1

## I.

In January 2000, EPL's predecessor, EPL Ltd., purchased certain assets relating to oil and gas production from Ocean Energy, Inc. Docket No. 7, Ex. 1 ¶ 2. Some of the assets are located on the Outer Continental Shelf—a term referring to "all submerged lands lying seaward and outside of the area of lands beneath navigable waters" around the United States, 43 U.S.C. § 1331(a). Docket No. 1, Ex. 2 §§ 4.11, 9.03, 9.07, 13.01. Other assets are in state waters or onshore. *See, e.g.*, *id.* at 70–75. The sale agreement required EPL Ltd. to purchase bonds (known as the "Devon Bonds") to "protect Ocean Energy . . . from [] exposure to potential future costs and obligations." Docket No. 14 at 4; *see also* Docket No. 1, Ex. 4 ¶ 7. EPL Ltd. secured such bonds and "has been maintaining" them "at its cost . . ." Docket No. 1, Ex. 4 ¶¶ 9, 15. EPL Ltd. later transformed into EPL. Docket No. 7, Ex. 1 ¶ 2.

In June 2015, EPL and Defendants entered into a Purchase and Sale Agreement ("PSA") providing for the sale of the aforementioned assets to Defendants. Docket No. 1, Ex. 2 § 1.01. This dispute centers on which party is obligated to maintain the Devon Bonds. Under § 7.08 of the PSA, EPL initially "retain[ed] all rights and obligations with respect to the [Devon Bonds] . . . and all obligations under the Devon Bonds . . ." Docket No. 1, Ex. 2 § 7.08. But the PSA required EPL to hold these obligations only until June 30, 2018, at which time Defendants "agree[d] to obtain a replacement for the Devon Bonds . . . in order that [EPL could] terminate the Devon Bonds . . ." *Id.* It is undisputed that Defendants have not replaced the bonds. Docket No. 7 at 2 (citing Docket No. 1, Ex. 5 at 323).

EPL brought this action on May 19, 2022, in the 173rd Judicial District Court, Henderson County, Texas, seeking: a declaratory judgment affirming Defendants' breach of contract, injunctive relief compelling specific performance, and damages. Docket No. 1, Ex. 4 at 4–7. Defendants removed the case to this Court on June 3, 2022, asserting subject matter jurisdiction under OCSLA. Docket No. 1. Defendants seek to dismiss the action and compel arbitration. Docket No. 2. Defendants assert that § 14.12 of the PSA obligates the parties to arbitrate "[a]ll disputes arising out of, or in connection with" the PSA, Docket No. 1, Ex. 2 § 14.12, which includes the present case.

EPL seeks remand, arguing that OCSLA jurisdiction is lacking because the dispute does not arise out of an injury that physically occurred on the OCS or that affects physical operations on the OCS. Docket No. 7. EPL also opposes arbitration because, it asserts, § 14.13 of the PSA expressly permits either party to seek an injunction in court "to prevent breaches of the provisions [of the PSA]." Docket No. 1, Ex. 2 § 14.13.

The Court addresses each motion in turn.

## II.

EPL seeks remand for lack of subject matter jurisdiction, which the Court addresses first. *See, e.g., Whiting-Bey v. Dehner*, 2013 WL 6501272, at *2 (N.D. Tex. Dec. 10, 2013) (citing *Ruhgras AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)) ("[T]he Court has an independent duty to first determine whether it has subject matter jurisdiction."). As explained below, the Court concludes that OCSLA confers jurisdiction here because the case arises out of or in connection with OCS operations.

## A.

A defendant may generally remove a case from state court if the federal court would have had original jurisdiction. *See* 28 U.S.C. § 1441(a); *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014). Here, Defendants invoke jurisdiction under § 1349 of OCSLA, which provides in relevant part:

> [T]he district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals.

43 U.S.C. § 1349(b)(1)(A). OCSLA's jurisdictional grant is "straightforward and broad." *In re Deepwater Horizon*, 745 F.3d at 163; *see also Recar v. CNG Producing Co.*, 853 F.2d 367, 369 (5th Cir. 1988) ("The reach of OCSLA is broad."). By enacting OCSLA, "Congress intended for the 'judicial power of the United States to be extended to the entire range of legal disputes that it knew would arise relating to resource development on the Outer Continental Shelf.'" *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994).

Section 1349 of OCSLA uses "undeniably broad" terms. *Id.* at 569. "Arising out of" generally means "originating from, having its origin in, growing out of or flowing from, or in short, incident to, or having connection with." *Hamilton v. United Healthcare of La.*, 310 F.3d 385, 392 (5th Cir. 2002) (cleaned up) (citing *Red Ball Motor Freight, Inc. v. Emps. Mut. Liab. Ins. Co. of Wisc.*, 189 F.2d 374, 378 (5th Cir. 1951); *Arise*, BLACK'S LAW DICTIONARY (7th ed. 1999)). "Connection" generally means a "relationship or association in thought (as of cause and effect, local sequence, mutual dependence or involvement)[;]" "[t]he condition of being related to something

4

else by a bond of interdependence, causality, logical sequence, coherence, or the like[;]" or a "relation between things one of which is bound up with, or involved in, another." *United States v. Am. Com. Lines, L.L.C.*, 875 F.3d 170, 175 (5th Cir. 2017) (collecting dictionary definitions in the statutory context).

Thus, in *EP Operating*, the Fifth Circuit held that a partition suit involving property on the OCS "is sufficiently connected with the operation of those offshore facilities to come within the broad phrase 'arising out of, or in connection with.'" *EP Operating Ltd. P'ship*, 26 F.3d at 569. Similarly, in *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, the court held that a contract dispute involving the construction of a platform on the OCS was "surely encompass[ed]" by the "arising out of, in connection with" language in § 1349. 754 F.2d 1223, 1227 (5th Cir. 1985); *see also United Offshore Co. v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 406–07 (5th Cir. 1990) ("It is clear" that OCSLA "provides jurisdiction over" whether pipeline owners must arbitrate a management dispute over the pipeline, even if the dispute is "one step removed from the actual transfer of minerals to shore."). And in *Deepwater Horizon*, the Fifth Circuit held that a suit to recover penalties under a Louisiana wildlife statute "arose out of or in connection with" operations on the OCS because "'the oil and other contaminants would not have entered into the State of Louisiana's territorial waters 'but for' [the] drilling and exploration operation'" on the OCS. 745 F.3d at 163–64 (quoting *In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 747 F. Supp. 2d 704, 708 (E.D. La. 2010)). Indeed, the *Deepwater Horizon* court explained that § 1349 requires only "a but-for connection" between the lawsuit and the OCS

5

operation. *See id.* at 163 (citing cases).

The term "operation" in § 1349 is likewise broad. The Fifth Circuit has held that it generally means "the doing of some physical act." *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1207 (5th Cir. 1988); *Tenn. Gas Pipeline v. Hous. Cas. Ins. Co.*, 87 F.3d 150, 154 (5th Cir. 1996). "Operation" may also include "the subsequent cessation, suspension or reduction of production" on the OCS because such conduct would have "an immediate bearing on the production of the [OCS] well[.]" *Amoco Prod. Co.*, 844 F.2d at 1209–10; *see also EP Operating Ltd. P'ship*, 26 F.3d at 568 (holding that "operation" includes the cessation of activity on offshore facilities and that "temporary lulls in activity should not control jurisdiction in federal court"). The term "operation" is broadly construed because it "does not stand alone, but rather [] is used in conjunction with the terms 'exploration,' 'development,' and 'production,'" which are defined broadly in OCSLA. *EP Operating Ltd. P'ship*, 26 F.3d at 568 (citation omitted). Indeed, the terms "exploration," "development," and "production" "encompass the full range of oil and gas activity from locating mineral resources through the construction, operation, servicing and maintenance of facilities to produce those resources." *Id.*

Here, the Court easily concludes that this case arises out of or in connection with an OCS operation. The case concerns the obligation to maintain the Devon Bonds, which are required by the PSA primarily to protect the predecessor in interest from liability relating to the decommissioning and abandonment of wells on the OCS. Minute Entry, 07/18/2022; *see also* Docket No. 12, Ex. 4 ¶¶ 5–6; Docket No. 7, Ex. 2

Art. 17.2.2; Docket No. 1, Ex. 2 § 7.08.  Indeed, the Devon Bonds are regulated by the U.S. Bureau of Ocean Energy Management because they cover OCS activity, their cost correlates directly to the estimated decommissioning costs for OCS wells, and approximately seventy-five percent ($67 million of $90 million) of the liability covered by the bonds relates specifically to assets located on the OCS.  Docket No. 7, Ex. 2, Art. 17.2.2; Docket No. 12, Ex. 4 ¶¶ 5–6; Docket No. 1, Ex 2 § 7.08; *see also* U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt., Notice to Lessees No. 2015-N04 – General Financial Assurances (Aug. 17, 2015) (available at https://tinyurl.com/ydbfdmc3).

Stated another way, the abandonment or decommissioning of wells on the OCS is an "operation" under OCSLA.  *See Amoco Prod. Co.*, 844 F.2d at 1209–10; *see also EP Operating Ltd. P'ship*, 26 F.3d at 568.  And but for this OCS operation, the Devon Bonds would not exist as they are, and this lawsuit would never have been filed.  *See* Docket No. 12, Ex. 4 ¶ 7.  *See, e.g.*, *Deepwater Horizon*, 745 F.3d at 163–64 (but for OCS oil spill, lawsuit would not have arisen); *Laredo Offshore Constructors, Inc.*, 754 F.2d at 1227 (but for OCS platform construction, breach of contract lawsuit would not have arisen).

## B.

EPL nonetheless opposes jurisdiction because the activity causing the injury here is not an "operation on the OCS relating to mineral production."  Docket No. 7 at 5.  Rather, EPL contends, its injury is Defendants' failure to replace the Devon Bonds, which is "inaction onshore, at their corporate headquarters," not any "'physical act' on the OCS."  *Id*. at 8.  But nothing in the text of § 1349 requires that

7

an OCS "operation" cause the injury—only that the case arise out of or in connection with an "operation." *See* § 1349(b)(1)(A).

To be sure, the court in *Deepwater Horizon* noted that courts "typically assess jurisdiction . . . in terms of . . . whether the activities that cause the injury constituted an 'operation.'" 745 F.3d at 163. But the court did not overrule—much less cast doubt upon—the numerous cases in which the activity causing injury was offshore, as here. *See, e.g.*, *Amoco Prod. Co.*, 844 F.2d at 1204 (upholding OCSLA jurisdiction in breach of contract dispute regarding the purchase of natural gas produced on the OCS); *United Offshore*, 899 F.2d at 407 (upholding OCSLA jurisdiction in breach of contract dispute regarding the management of on-OCS assets); *see also Cox Operating, L.L.C. v. Expeditors & Prod. Servs. Co.*, 2021 WL 2853060, at *2–4 (E.D. La. July 8, 2021) (upholding OCSLA jurisdiction in breach of contract dispute relating to liens filed against property on the OCS). The court in *Deepwater Horizon*, moreover, expressly disclaimed "a situs requirement for OCSLA jurisdiction," which is what EPL is demanding here. 745 F.3d at 164. "Because federal jurisdiction exists for cases 'arising out of, or in connection with' OCS operations . . . the statute precludes an artificial limit based on situs and the [defendants'] formulation conflicts with this court's but-for test." *Id.*[1]

---

[1] EPL also argues that the connection between this dispute and the OCS is too remote because the case does not directly impact OCS production. Docket No. 14 at 3. But a change in production is merely "[i]nstructive as to what types of cases" may fall within OCSLA jurisdiction. *EP Operating Ltd. P'ship*, 26 F.3d at 569–70. Nothing in the text of OCSLA requires the lawsuit to affect production. 43 U.S.C. § 1349(b)(1)(A); *see also, e.g.*, *Doucet v. Danos*, 856 F. App'x 550, 551 (5th Cir. 2021) (upholding OCSLA jurisdiction where a change to OCS production resulting from the dispute was impossible); *Total E&P USA, Inc. v. Marubeni Oil & Gas (USA)*, 824 F. App'x 197, 203 (5th Cir. 2020) (same).

EPL also argues that "the dispute between the parties could have arisen even if no OCS assets had been transferred through the PSA." Docket No. 7 at 10. The assets transferred via the PSA, EPL contends, include those located onshore and in state waters, and the Devon Bonds "likewise relate to assets located onshore and in state waters." *Id*. But there is no evidence that the bonding requirement would exist without the assets located on the OCS. Nor is there evidence that the parties would have ever entered into the PSA absent the OCS assets. Rather, the PSA covers both onshore and offshore assets, and it includes a single, indivisible bonding requirement covering substantial assets on the OCS. Docket No. 7, Ex. 2 Art. 17.2.2; Docket No. 12, Ex. 4 ¶ 4; Docket No. 1, Ex. 2, § 7.08. Because that requirement lies at the heart of this dispute, the case arises out of or in connection with an OCS operation. *See EP Operating Ltd. P'ship.*, 26 F.3d at 570; *Apache Corp. v. Global SantaFe Drilling Co.*, 832 F. Supp. 2d 678, 690 (W.D. La. 2010).

\*   \*   \*

Accordingly, EPL's motion to remand (Docket No. 7) is **DENIED**.

### III.

Defendants move to dismiss the case and compel arbitration pursuant to § 14.12 of the PSA. Docket No. 2. EPL argues that § 14.13 carves out claims for injunctive relief, which may be brought in court. As explained below, § 14.12 of the PSA is a valid arbitration provision that delegates the issue of arbitrability to the arbitrator. And EPL's reliance on § 14.13 is misplaced. Accordingly, the Court grants Defendants' motion.

### A.

The Supreme Court has long held that the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, manifests a "liberal federal policy favoring arbitration agreements" and guarantees their enforcement. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983)). Similarly, the Louisiana Supreme Court has held that, pursuant to the Louisiana Binding Arbitration Law ("LBAL"), "the positive law of Louisiana favors arbitration." *Aguillard v. Auction Mgmt. Corp.*, 908 So. 2d 1, 7 (La. 2005) (citing LA. REV. STAT. § 9:4201)).[2] "Such favorable treatment echo[e]s the" FAA, *id.*, to such an extent that "the LBAL is virtually identical to the FAA, and determinations regarding the viability and scope of arbitration clauses are the same under either law[,]" *Duhon v. Activelaf, LLC*, 2016 WL 6123820, at *3 (La. Oct. 19, 2016). For this reason, "federal jurisprudence interpreting the FAA may be considered in construing the LBAL." *Id.* Under both the FAA and the LBAL, courts use the following two-step process in determining the threshold matter of arbitrability: first, they determine "whether there is a valid agreement to arbitrate between the parties[,]" and, if so, they analyze "whether the dispute in question falls within the scope of that arbitration agreement." *Traders' Mart, Inc. v. AOS, Inc.*, 268 So. 3d 420, 427 (La. 2d Ct. App. 2019) (citing *Long v. Jeb Breithaupt Design Build*

---

[2] The PSA provides that Louisiana law governs. Docket No. 1, Ex. 2 § 14.09 ("This Agreement and . . . any dispute arising under or relating to this Agreement shall be construed in accordance with, and governed by, the laws of the State of Louisiana. . .").

10

*Inc.*, 4 So. 3d 930, 936 (La. 2d Ct. App. 2009)); *see also Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996).

Typically, "both steps are questions for the court." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2012). But where the arbitration agreement includes "a delegation clause giving the arbitrator the primary power to rule on the arbitrability of a specific claim," the court must refer the claim "to allow the arbitrator to decide gateway arbitrability issues." *Id.* at 202; *see also, e.g., IQ Prods. v. WD-40 Co.*, 871 F.3d 344, 348–49 (5th Cir. 2017); *Reyna v. Int'l Bank of Com.*, 839 F.3d 373, 378 (5th Cir. 2016). The delegation clause must "evince[] an intent to have the arbitrator decide whether a given claim must be arbitrated." *Kubala*, 830 F.3d at 202; *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 279 (5th Cir. 2019). "When determining that intent, 'courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *Archer & White Sales, Inc.*, 935 F.3d at 279 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

In *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, moreover, the court held that expressly adopting the American Arbitration Association's ("AAA") Rules of Arbitration "presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." 687 F.3d at 671, 675 (5th Cir. 2012). Those Rules provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *Id.*; *Commercial Arbitration Rules and Mediation*

*Procedures, Rule 7(a)*, AM. ARBITRATION ASS'N (Sept. 1, 2022), https://www.adr.org/sites/default/files/Commercial_Rules_Web.pdf.

If the parties agreed to arbitrate arbitrability, "the role of the federal court[] is strictly limited—we must refer the claim to arbitration absent some exceptional circumstance." *Kubala*, 830 F.3d at 203; *see also Archer & White Sales, Inc.*, 935 F.3d at 279 ("If there is a delegation clause, the court must grant the motion to compel.").

**B.**

Here, the parties agree that a valid and binding arbitration agreement exists. Docket No. 2 at 4; Docket No. 8 at 5. The only question is whether the present dispute falls within its scope.

Defendants contend that the PSA expressly incorporates the AAA's Arbitration Rules, and thus the arbitrator must answer this question. Section 14.12 states in relevant part:

> All disputes arising out of, or in connection with, this Agreement (except such disputes regarding the Final Settlement Statement, the procedures for which are provided for in Section 9.06) or any determination required to be made by Buyer and Seller as to which the Parties cannot reach an agreement shall be settled by arbitration in Houston, Texas.
>
> . . . .
>
> The arbitration shall be conducted pursuant to the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association (except to the extent the Parties may agree otherwise). Any award by the arbitrators shall be final, binding on the Parties and non-appealable, and judgment may be entered thereon in any court of competent jurisdiction.

Docket No. 1, Ex. 2 § 14.12.

EPL acknowledges the parties delegated the arbitrability of some claims, but contends that § 14.13 carved out claims for injunctive relief. Section 14.13 states:

> The Parties acknowledge and agree that irreparable damage would occur in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached. It is accordingly agreed that the Parties shall be entitled to an injunction to prevent breaches of the provisions of this Agreement, and shall be entitled to enforce specifically the provisions of this Agreement, in any court of the United States or any state thereof having jurisdiction, in addition to any other remedy to which the Parties may be entitled under this Agreement or at law or in equity.

Docket No. 1, Ex. 2 § 14.13.

EPL is mistaken. In analyzing similar language in *Crawford Professional Drugs, Inc. v. CVS Caremark Corp.*, the Fifth Circuit held that incorporating the AAA Rules was "clear and unmistakable evidence that the parties . . . agreed to arbitrate arbitrability." 748 F.3d 249, 262–63 (5th Cir. 2014). It did not matter that the agreement also stated that "either party . . . [could] seek[] injunctive relief for breach of this [] Agreement in any state or federal court of law." *Id.* at 256. The court thus concluded that the arbitrability of plaintiffs' claims—including claims for injunctive relief—"must be decided in the first instance by the arbitrator, not a court." *Id.* at 263; *see also, e.g.*, *DXP Enters. v. Goulds Pumps, Inc.*, 2014 WL 5682465, at *7 (S.D. Tex. Nov. 4, 2014) (Clauses that "simply state that parties can ask courts for injunctive relief 'notwithstanding' an agreement to arbitrate do not sufficiently show that the claims for permanent injunctive relief are nonarbitrable.").

EPL cites *Archer & White*, but that case is distinguishable. In *Archer & White*, the agreement expressly excluded claims for injunctive relief from arbitration

13

altogether. 935 F.3d at 281. The agreement stated: "Any dispute arising under or related to this Agreement (*except for actions seeking injunctive relief . . .* ), shall be resolved by binding arbitration in accordance with the arbitration rules of the [AAA]." *Id*. at 277 (emphasis added). The "most natural reading" of this language was that "any dispute, except actions seeking injunctive relief, shall be resolved in arbitration in accordance with the AAA rules." *Id*. at 281. The agreement thus delegated arbitrability "for all disputes except those under the carve-out." *Id*. And "given the carve-out, we cannot say that the [] [a]greement evinces a 'clear and unmistakable' intent to delegate arbitrability" for claims of injunctive relief. *Id*. at 281–82.

Here, in contrast, the PSA does not expressly carve out injunctive relief claims. Rather, § 14.12 states that "[a]ll disputes arising out of, or in connection with, this Agreement" are subject to arbitration in accordance with the AAA's Rules. Docket No. 1, Ex. 2 § 14.12. The only carve-out in § 14.12 is for "disputes regarding the Final Settlement Statement," which is not at issue here. *Id*. The injunction clause in § 14.13, moreover, does not even mention arbitration. Rather, it merely "permits parties to apply to a court for temporary injunctive relief to maintain the status quo pending arbitration, but not to request permanent injunctive relief that would require a court to consider and decide the merits of an arbitrable claim." *DXP Enters.*, 2014 WL 5682465, at *5 (interpreting similar injunction clause). Or, as Defendants' counsel suggested at oral argument, § 14.13 may also permit court orders to enforce an arbitration award of injunctive relief. Minute Entry, 07/18/2022.[3] The PSA is

---

[3] EPL is therefore wrong in arguing that § 14.13 is surplusage under Defendants' interpretation. *See In re Liljeberg Enters., Inc.*, 304 F.3d 401, 443 (5th Cir. 2004) (Louisiana law requires the court "to

14

thus much more similar to the agreement in *Crawford* than *Archer & White*. Indeed, the defendant in *Archer & White* had argued unsuccessfully that "*Crawford* controls and the only difference between that arbitration agreement and the one here is syntax—the ordering of words." *Id.* at 281. But, the Fifth Circuit explained in *Archer & White*, "that is precisely the point—the placement of the carve-out [in the arbitration clause itself] is dispositive."

The Court thus concludes that the PSA delegates the arbitrability of all claims to the arbitrator. And having made that conclusion, the Court's work is done. *See Kubala*, 830 F.3d at 203. Defendants' motion to dismiss and compel arbitration (Docket No. 2) is hereby **GRANTED**.[4]

## IV.

The Court determines that it has jurisdiction to adjudicate the motion to compel arbitration and that the parties agreed to arbitrate all claims in this dispute. Accordingly, EPL's motion to remand (Docket No. 7) is **DENIED**, and Defendants' motion to dismiss and compel arbitration (Docket No. 2) is **GRANTED**.

The Court **DISMISSES** the case without prejudice.

So **ORDERED** and **SIGNED** this **9th** day of **November, 2022.**

_____
JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE

---

avoid neutralizing, ignoring or treating as mere surplusage any provision."); *cf.* Docket No. 8 at 6.

[4] "[T]he Fifth Circuit encourages district courts to dismiss cases with nothing but arbitrable issues because staying the action serves no purpose." *Armstrong v. Assocs. Int'l Holdings Corp.*, 242 F. App'x 955, 959 (5th Cir. 2007) (citing *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992)).